# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 12-61850-CIV-WILLIAMS

ELIZABETH ARDEN RESORT SPAS,
INC., and ARCH SPECIALTY INSURANCE
COMPANY,
      Plaintiffs,

vs.

BONAVENTURE HOTEL ASSOCIATES, LTD.,
and ZURICH AMERICAN INSURANCE COMPANY,
      Defendants.

ZURICH AMERICAN INSURANCE COMPANY,
      Plaintiff,

vs.

BONAVENTURE HOTEL ASSOCIATES, LTD.,
      Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court on the extensively briefed motions for

summary judgment filed by Elizabeth Arden Resort Spas, Inc. d/b/a Red Door Lifestyle

Spa, Arch Specialty Insurance Company, Zurich American Insurance Company, and

Bonaventure Hotel Associates, Ltd. d/b/a Bonaventure Resort & Spa.[1]  The Court has

had the benefit of oral argument from the Parties.  For the reasons discussed at the

---

[1] Four sets of summary judgment briefing set forth the Parties' positions regarding the duties of the two insurance companies: four motions for summary judgment (DE 65, 67, 69, and 71), four responses, and four replies.  (DE 75, 77, 78, and 79; DE 90, 91, 92, and 93).  Red Door joins in Arch's arguments in their entirety.  Bonaventure adopted (DE 81) the arguments presented in the Arch motion for summary judgment (DE 67) as its response to Zurich's motion for summary judgment on the complaint (DE 69) and adopted (DE 82) the arguments presented in Zurich's motion for summary judgment on its counterclaim (DE 71) as its response to Arch's motion for summary judgment on Zurich's counterclaim.

The Court also allowed the Parties to present supplemental briefing concerning certain deposition testimony relevant to the disposition of the motions.  (DE 114–118).

hearing and stated below, Zurich's motions for summary judgment are **GRANTED** and Arch's motions are **DENIED**.

I.  <u>BACKGROUND</u>[2]

This case involves potential coverage obligations arising from an alleged sexual assault that took place during a massage treatment at Red Door. The Parties filed two declaratory judgment actions to determine duty to defend obligations under two insurance policies: Arch's policy issued to Red Door and Zurich's commercial general liability policy issued to Bonaventure Hotel Associates, Ltd. (DE 109 at 8). The Parties ask the Court to determine whether Zurich has a duty to defend Red Door and whether Arch has a duty to defend Bonaventure. (DE 109 at 3).

Red Door managed a spa for Bonaventure pursuant to a Spa Management Agreement. (*Id.*; DE 1 ¶ 9; DE 23 countercl. ¶ 10). Under the terms of the Agreement, Bonaventure was the owner of the spa; Elizabeth Arden d/b/a Red Door was the operator of the spa,[3] acting as Bonaventure's agent. (DE 1-1 at 5 ¶ 1.1, 6 ¶ 1.4 Relation of the Parties). Although Red Door employed the spa staff, Bonaventure was responsible for high-level administrative oversight such as yearly approval of the spa budget. (*Id.* at 11 ¶ 4.5 Annual Plan and Capital Budget; 13–14 ¶ 4.6 Spa Employees).

The Spa Management Agreement required Bonaventure to obtain a commercial general liability policy naming Red Door as an additional insured. (DE 1 ¶ 10; DE 1-1 at 19–20 ¶¶ 5.4(b)(i), (c)). Accordingly, Bonaventure obtained a commercial general liability coverage policy (number CPO 6540173-02) from Zurich for the period from April

---

[2] There is no disagreement regarding the following facts, many of which are set forth as uncontested in the Parties' statement of facts. (Parties' stipulated statement of uncontested facts, DE 109 7–9).

[3] (DE 1-1 at 4).

30, 2010 to April 30, 2011 (the "Zurich Policy"). (DE 109 at 8). The Zurich Policy was issued in Florida through non-party Aon Risk Services, Inc. and delivered to Bonaventure in Weston, Florida. (DE 1-3 at 2).

The Zurich Policy contains a General Liability Supplemental Coverage Endorsement, which provides coverage for certain additional insureds under specified circumstances. (DE 1-4 at 11–14). The Zurich Policy also contains a "Health, Spa or Cosmetic Service" exclusion that excludes bodily injury arising out of the rendering of or failure to render any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement, or personal grooming or therapy. (DE 1-4 at 34; DE 23 at 10). Finally, the Zurich Policy contains an Other Insurance Condition describing when the policy is primary and when it is excess over other insurance;[4] the Other Insurance Condition is applicable only "if other valid and collectible insurance is available to the insured for **a loss we cover**." (DE 1-4 at 21) (emphasis added).

The Spa Management Agreement required Red Door to maintain "[p]rofessional liability insurance insuring the spa and its employees and independent contractors (secondary to the independent contractor's primary coverage) against claims arising from services." (DE 1-1 at 20 ¶ 5.4(d)(i)). The Spa Management Agreement also obligated Red Door to name Bonaventure as an additional insured under its professional liability insurance policy. (*Id.* ¶ 5.4(e)). Red Door obtained a policy (number GPP0002524-05) from Arch for the policy period November 1, 2009 to November 1, 2010 ("Arch Policy"). The Arch Policy was issued to Elizabeth Arden

---

[4] (DE 1-4 at 21-22).

3

Salon Holdings, Inc.[5] in Stamford, CT through non-party Partners Specialty Group, Inc. (DE 23-2 at 1). Elizabeth Arden is listed on the binder as having an address at 300 Main Street, Stamford, Connecticut. (*Id.*).

Pursuant to the Arch Policy's Named Insured Endorsement, Plaintiff Elizabeth Arden Resort Spas, Inc. is a named insured on the Arch Policy. (DE 109 at 9 ¶ 9). Similar to the Zurich Policy, Arch's Policy contains a "Blanket Additional Insured Endorsement," which provides coverage for certain additional insureds under specified circumstances. (*Id.* ¶ 10). The Arch Policy also contains a provision stating that it is "excess over **any other valid and collectible insurance that applies** to any claim or 'suit' to which this insurance applies." (DE 23-2 at 23 ¶ IV(4)(d)) (emphasis added).

Following the incident at Red Door, Jane and John Doe filed a state court lawsuit styled *Jane Doe, and John Doe, her husband vs. Bonaventure Hotel Associates, LTD. d/b/a Bonaventure Resort & Spa, and Elizabeth Arden Resort Spas Inc. d/b/a Red Door Lifestyle Spa, and Dayron Escobar*, Case No. 11-27734, which is pending in the 17th Judicial Circuit Court in and for Broward County, Florida. (DE 109 at 7-8). The complaint in the Broward case (the "Underlying Complaint") seeks monetary damages against Red Door and Bonaventure for injuries related to an alleged sexual assault perpetrated upon Jane Doe during a massage she received as a customer of Red Door's spa on Bonaventure's premises. (DE 66 ¶¶ 2–4). The Underlying Complaint alleges that Jane Doe went to Red Door for its "Signature Stress Melter Ritual," a service that includes a body wrap and massage. *Id.* Doe claims that after masseuse Dayron Escobar began massaging her back, he suddenly and without warning sexually

---

[5] Elizabeth Arden Salon Holdings, Inc. is Plaintiff's parent company. (DE 1-2 at 38).

assaulted her. *Id.* The Underlying Complaint asserts the same claims against both Red Door and Bonaventure: (1) respondeat superior; (2) premises liability; (3) negligent retention and supervision; and (4) loss of consortium. (DE 1-5; DE 109 at 8).

In the wake of the lawsuit, Arch and Red Door filed their complaint seeking a declaration regarding Zurich and Bonaventure's duty to defend and indemnify Red Door for the claims brought against it in the Underlying Complaint. (DE 1 ¶ 6). Arch and Red Door further seek a declaration that Bonaventure and Zurich should reimburse them for out of pocket costs incurred in defense of the Underlying Complaint—Red Door for the costs it has incurred and Arch for the costs that it has incurred and paid on behalf of Red Door. (*Id.* ¶ 7). Zurich counterclaimed that Arch and Red Door have a duty to defend and indemnify Bonaventure and a duty to indemnify Zurich for its expenses. (DE 23 countercl. at 12-23 ¶ 7). Accordingly, Zurich seeks a declaration that the policy issued by Arch to Red Door obligates Arch to defend Bonaventure from the Underlying Complaint. (*Id.* at 16 ¶ 25). There appears to be no difference between the grounds Plaintiffs and Defendants advance in their respective motions for summary judgment and the grounds each identify in opposition to the other's motion.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Parties agree that there is no dispute of material fact and that the issue of the insurers' duty to defend is ripe for decision as a matter of law. (DE 109 at 7–9).

## III. POLICY TERMS

### A. Zurich Policy

#### EXCLUSION – SPECIFIED THERAPEUTIC OR COSMETIC SERVICES

**Endorsement CG 22450798** - Description Of Operations: ANY AND ALL HEALTH, SPA OR COSMETIC SERVICES:

*[T]his insurance does not apply to "bodily injury"*, "property damage" or "personal and advertising injury" ***arising out of the rendering of or failure to render any service, treatment, advice or instruction for the purpose of*** appearance or skin enhancement, hair removal or replacement, or personal grooming or ***therapy.***

(Zurich Policy DE 1-4 at 34) (emphasis added).

### B. Arch Policy

#### PROFESSIONAL SERVICES EXCLUSIONS WITH LIMITED EXCEPTIONS:

This insurance does not apply to any claim, "suit", demand or loss that alleges "bodily injury", "property damage" or "personal and advertising injury" that in any way, in whole or in part, arises out of, relates to or results from the rendering or failure to render any professional service. However, ***this exclusion does not apply to "bodily injury" or "property damage" arising out of the following:***

**6.    Massage services**

(Arch Policy DE 23-2 at 35) (emphasis added).

\*        \*        \*

#### BLANKET ADDITIONAL INSURED ENDORSEMENT

**Section II – WHO IS AN INSURED** is amended to include as an additional insured those persons or organizations who are required under a written contract with you to be named as an additional insured, but only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of your subcontractors:

A. In the performance of your ongoing operations or "your work", including "your work" that has been completed; or

B. In connection with your premises owned by or rented to you.

(Arch Policy DE 23-2 at 49).

## IV. DISCUSSION

The Parties agree that Florida law applies to the Zurich Policy[6] and Connecticut law applies to the Arch Policy.[7]   Consistent with its filings, Arch argued at the summary judgment hearing that both Policies covered the claims alleged in the Underlying Complaint and that the policies' Expected or Intentional Injury or Damage exclusions[8] did not apply to bar coverage.  Thus, Arch has conceded that its Policy provides coverage in this instance.  Accordingly, the Court must determine only whether Zurich's spa exclusion applies and whether Bonaventure is an additional insured under the Arch Policy.

### A. *Insurance Policy Interpretation*

Florida and Connecticut courts apply the same basic cannons of contract interpretation to insurance policies and contract interpretation is generally a question of law. *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995); *Arrowood Surplus Lines Ins. Co. v. Westport Ins. Corp.*, Case No. 3:08CV01393 AWT, 2010 WL 56108, at *2 (D. Conn. Jan. 5, 2010) ("Under Connecticut law, the interpretation of an insurance policy is a question of law for the court.").  When interpreting an insurance policy, courts "start with the plain language of the policy, as bargained for by the parties."  *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226,

---

[6] (DE 109 at 9 ¶ 1).

[7] At the hearing on September 24, 2014, the Parties agreed that Connecticut law applied.

[8] DE 1-4 at 17-18; DE 23-2 at 6; DE 67 at 11.

1230 (11th Cir. 2004) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)); *Heyman Assocs. No. 1 v. Ins. Co. of State of Pa.*, 653 A.2d 122, 130 (Conn. 1995) ("The determinative question is the intent of the parties, that is, what coverage the ... [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy.") (citation omitted). A court looks at the policy as a whole and gives every provision its full meaning and operative effect. *Steinberg*, 393 F.3d at 1230; *see also Travelers Indem. Co. v. PCR Inc.*, 889 So. 2d 779, 785 (Fla. 2004) (stating that if "the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as it was written."); *Arrowood Indem. Co. v. King*, 699 F.3d 735, 739 (2d Cir. 2012) ("[U]nder Connecticut law, an insurance policy is to be interpreted by the same general rules that govern the construction of any written contract.") (internal quotation and citation omitted).

As such, the court interprets the policy language according to its "'everyday meaning' as it is 'understandable to the layperson.'" *Ohio Cas. Ins. Co. v. Cont'l Cas. Co.*, 279 F. Supp. 2d 1281, 1283 (S.D. Fla. 2003) (quoting *Hrynkiw v. Allstate Floridian Ins. Co.*, 844 So. 2d 739, 741 (Fla. 5th DCA 2003)). If the policy language, including any exclusionary term, is unambiguous, the court must apply the policy language as written. *See Steinberg*, 393 F.3d at 1230 ("If [the policy] language is unambiguous, it governs."); *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1139 (Fla. 1998) ("[A] court cannot place limitations upon the plain language of a policy exclusion."); *King*, 699 F.3d at 739 ("If the terms of the policy are clear and unambiguous, then the [contract] language . . . must be accorded its natural and

ordinary meaning.") (citation omitted). But if exclusionary clauses are ambiguous, they are construed more narrowly than grants of coverage. *Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.*, 165 F. Supp. 2d 1332, 1336 (S.D. Fla. 2001); *see also Heyman*, 653 A.2d at 130.

To find an ambiguity, there must be a genuine inconsistency or uncertainty in meaning that remains after resort to the ordinary rules of construction; ambiguity is not invariably present when a contract requires interpretation. *Dahl-Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1382 (11th Cir. 1993); *King*, 699 F.3d at 739–40 ("In determining whether the terms of an insurance policy are clear and unambiguous, a court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms."). Failing to define a term does not create *per se* ambiguity and courts may consider other sources for definition. *Dahl-Eimers*, 986 F.2d at 1382; *see also Essex Ins. Co. v. Zota*, 607 F. Supp. 2d 1340, 1356 (S.D. Fla. 2009); *Heyman*, 653 A.2d at 131. Furthermore, an undefined term is not ambiguous if it has a generally accepted meaning. *Flamingo S. Beach I Condo. Ass'n, Inc. v. Selective Ins. Co. of Se.*, 492 F. App'x 16, 20 (11th Cir. 2012) (referencing dictionary definition, finding no ambiguity, and enforcing policy as written).

## B. *Duty to Defend*

The question of whether a certain situation falls within the coverage of an insurance policy is one of law that may be decided by the Court. *Vogelsang v. Allstate*

*Ins. Co.*, 46 F. Supp. 2d 1319, 1320 (S.D. Fla. 1999); *Vt. Mut. Ins. Co. v. Ciccone*, 900 F. Supp. 2d 249, 256 (D. Conn. 2012).

### 1) <u>Florida Law – Zurich Policy</u>

Under Florida law, if the relevant pleadings allege facts that "fairly and potentially bring the suit within policy coverage," then the insurer must defend the action regardless of the merits of the lawsuit. *Jones v. Fla. Ins. Guar. Ass'n Inc.*, 908 So. 2d 435, 442–43 (Fla. 2005); *see also JDC (Am.) Corp.*, 52 F.3d at 1580. But when the pleadings clearly show that there is no coverage, the insurer has no duty to defend. *Md. Cas. Co. v. Fla. Atl. Orthopedics, P.L.*, 771 F. Supp. 2d 1328, 1332 (S.D. Fla. 2011). The same is true if the pleadings show that a policy exclusion applies. *Wilson ex. rel. Estate of Wilson v. Gen. Tavern Corp.*, 469 F. Supp. 2d 1214, 1218 (S.D. Fla. 2006) (finding no obligation to defend). Any ambiguities regarding the duty to defend must be resolved in favor of the insured. *See Jones*, 908 So. 2d at 443.

An insurer's duty to defend its insured against legal action depends solely on the facts and legal theories alleged in the pleadings and the claims against the insured. *JDC (Am.) Corp.*, 52 F.3d at 1580. This is a "bright-line test." *Wilson*, 469 F. Supp. 2d at 1218. Therefore, the duty to defend is determined by comparing the allegations contained within the four corners of the complaint with the language of policy. *See Jones*, 908 So. 2d at 443; *Yachtman's*, 595 F. Supp. 2d. at 1322. Evidence extrinsic to the underlying complaint and the insurance policy is irrelevant to the duty to defend. *Lime Tree Vill. Cmty. Club Ass'n, Inc. v. State Farm Gen. Ins. Co.*, 980 F.2d 1402, 1406 (11th Cir. 1993) (holding that a court "may only look to the factual allegations of the underlying complaint"). Facts brought out in discovery and other extrinsic evidence are

not properly considered by the Court when analyzing a duty to defend under Florida law. *Szczeklik v. Markel Int'l Ins. Co., Ltd.*, 942 F. Supp. 2d 1254, 1260 n.6 (M.D. Fla. 2013).

Applying the bright-line test to the allegations of a complaint can become a more nuanced process when the question of coverage turns on whether the claim "arises out of" insured—or excluded—conduct. The Parties cite repeatedly to Florida cases considering "arising out of" language in the context of automobile policies. The Court discusses them to provide context for the ultimate conclusion that, when insurance policies grant or exclude coverage for claims "arising out of" specified conduct, the connection required between that conduct and the claims is relatively slight, consisting of some level of causation greater than coincidence.

In *GEICO v. Novak*, 453 So. 2d 1116 (Fla. 1984), a woman was shot in her car by a stranger when she refused to give him a ride. *Id.* at 1117. A determination of coverage turned on whether the attack could be interpreted as "arising out the of the use of a motor vehicle." *Id.* at 1119. The Florida Supreme Court held that it was "well settled that 'arising out of' does not mean proximately caused by, but has a much broader meaning." *Id.* (internal quotation and citation omitted). Therefore, because of the "highly substantial connection" between the use of the motor vehicle and the event in that case, the Florida Supreme Court found coverage. *Id.*

In considering the allegations of the Underlying Complaint, the Parties cite to a later case decided by the Florida Supreme Court, *Race v. Nationwide Mut. Fire Ins. Co.*, 542 So. 2d 347 (Fla. 1989). However, they disagree as to the precedential value of the

opinion and the application of the "three rather interesting rules"[9] it referred to for interpreting the insurer's coverage obligation. *Id.* at 349 ("1. The accident must have arisen out of the inherent nature of the automobile, as such; 2. The accident must have arisen within the natural territorial limits of an automobile, and the actual use, loading, or unloading must not have terminated; 3. The automobile must not merely contribute to cause the condition which produces the injury, but must, itself, produce the injury."). Then-Justice Barkett[10] sagely predicted the defect in an opinion that rejected the *Novak* test[11] without clearly articulating the standard for its replacement: "I cannot discern from the majority opinion precisely what test will control this issue in the future." *Id.* at 351–52 (Barkett, J. concurring).

The practical problem with the "*Race* test" (aside from the notion that the "rules" referenced appear to be dicta) is that it concerns the use of an automobile and applying its reasoning by analogy is problematic because courts have been reluctant to explicitly define its terms. *Id.* at 349, 351. For example, the court in *Allstate Ins. Co. v. Safer*, 317 F. Supp. 2d 1345 (M.D. Fla. 2004), found that *Race* "did not overrule the majority standard [that there must be a causal connection between the injury and the vehicle] set forth in earlier case law" and "did not explicitly apply the three part inquiry from Appleman to the facts of the case before it." *Id.* at 1357. Echoing Judge Barkett's

---

[9] Arch, and some courts, have referred to the three-part "test" announced in *Race*. But, the Florida Supreme Court did not clearly adopt the rules, which come from a treatise: 6B JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 4317 (Buckley ed. 1979). Nevertheless, the undersigned refers to the "*Race* test" for ease of discussion.

[10] Former Florida Supreme Court Chief Justice and Eleventh Circuit Judge Barkett now sits on the Iran-United States Claims Tribunal in The Hague.

[11] Judge Barkett concurred in the result in *Race* because, even under the *Novak* analysis, which requires some nexus between automobile and motor vehicle, the connection was "too tenuous." *Id.* at 352.

concerns, the district court worried that the *Race* test is "enigmatic" and "difficult to apply in a principled manner," before concluding that the Florida Supreme Court would not find the three-part inquiry quoted in *Race* as the applicable standard. *Id.* at 1357–58.

For guidance on the application of "arising out of" language in a commercial general liability policy, Arch urges the Court to focus on two cases from Florida's Fourth District Court of Appeal: *Farrer v. U.S. Fid. & Guar. Co.*, 809 So. 2d 85 (Fla. 4th DCA 2002) (applying the *Race* test and finding that the exclusion did not apply) and *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So. 2d 176 (Fla. 4th DCA 1997) (finding that the term "arising out of" was ambiguous). In *Farrer*, a Florida appellate court determined that a policy exclusion did not apply when it concluded that a sexual assault in a taxi cab "did not 'arise out of' the use of a vehicle." *Id.* at 95 (narrowly construing the "arising out of" exclusion and citing the *Race* test). However, the decision and discussion in *Farrer* provide little guidance to the Court and Parties here.

First, *Farrer* is of limited use because the court there did not define what constitutes the "inherent nature" of a vehicle. Second, the *Farrer* court implicitly found ambiguity that is not present in this case. Third, the reasoning of the opinion is particularly unsuited for application to the circumstances of this case. *See id.*; *see also Safer*, 317 F. Supp. 2d at 1357 (discussing *Race* and *Farrer* and instead applying the broader test from *Hagen v. Aetna Cas. & Sur. Co.*, 675 So. 2d 963, 965 (Fla. 5th DCA 1996)). In *Farrer*, the presence of a vehicle was merely fortuitous; the cab driver drove the taxi to a remote location where he then attacked his victim. *Farrer*, 809 So. 2d at 87, 94 (reasoning that an exclusion should not apply when "the particular manner of use

13

of the vehicle would not have altered or affected the real act of negligence."). Here, the assault on Doe was perpetrated by a masseuse, during a massage, at the spa where the service was expected to be performed. Thus, *Farrer* is inapt for the analysis in this case.[12]

Arch offers one other Florida case[13] to support a restrictive reading of "arising out of" policy language. In *Westmoreland*, a Florida appellate court found that an insurer had a duty to defend because the term "arising out of" in an exclusion was ambiguous. *Id.* at 180 ("Where a critical term is not defined in an exclusionary clause of the policy, it will be liberally construed in favor of an insured."). But Arch's reliance is misplaced; the *Westmoreland* opinion is "no longer good law" on that point. *Cont'l Cas. Co. v. City of Jacksonville*, 654 F. Supp. 2d 1338, 1346 n.2 (M.D. Fla. 2009) (citing *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532–33 (Fla. 2005)).

---

[12] Even if it were not distinguishable, *Farrer* militates against finding coverage under the Zurich Policy and in favor of finding coverage under the Arch Policy. The *Farrer* court reasoned that complementary insurance policies—*e.g.* auto and CGL or professional liability and CGL—should be interpreted to neither duplicate nor leave a gap in coverage. *Farrer*, 809 So. 2d at 94. As the court noted, parties might buy multiple policies, apportioning risk among them such that "[a]n automobile policy protects its insured for liability arising out of the use of that vehicle, while the general liability excludes coverage arising from the use of the vehicle." *Id.* While the Court cannot consider extrinsic evidence in determining Zurich's duty to defend under Florida law, the Court notes that, reading the Zurich and Arch Policies as a whole and considering them in the context of the Spa Management Agreement, it is clear that Arch, Red Door, Bonaventure, and Zurich intended the Arch Policy to be a professional services liability policy and the Zurich Policy to cover general liability. *See* Spa Management Agreement, DE 1-1 at 20 ¶ 5.4(d)(i) (requiring Red Door to maintain "[p]rofessional liability insurance insuring the spa and its employees and independent contractors . . . against claims arising from services."). Like the auto and CGL policies discussed in *Farrer*, the Zurich CGL Policy spa exclusion excludes precisely the risk allocated to the Arch Policy. (Arch Policy DE 23-2 at 35).

[13] Arch cites a New York case, *RJC Realty Holding Corp. v. Republic Franklin Ins. Co.*, 808 N.E.2d 1263, 1266 (N.Y. Ct. App. 2004), but does not explain why the Court should reach the same result under Florida law as it might under New York law. In other insurance coverage cases before the Court, the choice of law has been issue-determinative. *See, e.g., Nova Casualty Co. v. Onebeacon America Ins. Co.*, Case No. 12-CV-60824-Williams, DE 36 at 12 n.4 (S.D. Fla. Oct. 7, 2013).

The Florida Supreme Court's opinion in *Taurus* both abrogated *Westmoreland* and provided clarity regarding "arising out of" language in exclusionary clauses. *Taurus*, 913 So. 2d at 539 (agreeing with the majority of states in concluding that the term "arising out of" is unambiguous and should be interpreted broadly). Although the *Taurus* court confined its judgment to the "products-completed operations hazard exclusion" at issue, the opinion concludes that interpretation of the "arising out of" language in policy exclusions is not as limited as Arch contends. *Id.* Accordingly, post-*Taurus* Florida courts have applied a more expansive interpretation of the term "arising out of" to include originating from, having its origin in, growing out of, flowing from, incident to or having a connection with. *Sparta Ins. Co. v. Colareta*, 990 F. Supp. 2d 1357, 1368 (S.D. Fla. 2014); *Safer*, 317 F. Supp. 2d at 1349 (finding that the term "arising out of" is broader in meaning than the term "caused by"). Thus, in the context of exclusionary provisions containing the phrase "arising out of," the court in *Sparta* observed that Florida courts have concluded that the phrase requires only some level of causation greater than coincidence. *Sparta*, 990 F. Supp. 2d at 1368.

## 2) The Spa Exclusion Removes The Assault From Zurich's Coverage

The availability of coverage under the Zurich Policy turns on the Court's application of the spa exclusion in the context of the facts and legal theories alleged in Underlying Complaint. *JDC (Am.) Corp.*, 52 F.3d at 1580; *Adolfo House*, 165 F. Supp. 2d at 1336. The spa exclusion under the Zurich Policy is broadly written to exclude "ANY AND ALL HEALTH, SPA OR COSMETIC SERVICES." The spa exclusion provides that "this insurance does not apply to 'bodily injury' . . . arising out of the rendering of or failure to render any service [or] treatment . . . for the purpose of . . .

therapy." (Zurich Policy DE 1-4 at 34). It is well settled that exclusions should be narrowly construed, but only if an ambiguity in the exclusion triggers such a construction. *Sparta*, 990 F. Supp. 2d at 1364 (internal quotation and citation omitted) ("If the language employed in the policy is clear and unambiguous, there is no occasion for construction or the exercise of a choice of interpretations.").

However, in this case, there is no such ambiguity with regard to the language contained in the spa exclusion. Arch argues that the assault did not "arise out of the rendering of or failure to render" the Signature Stress Melter Ritual, which is a "service that includes a . . . massage." (DE 1-5 ¶ 9). But, in light of the developed Florida caselaw discussed previously, the Court does not find Arch's "arising out of" argument persuasive. *Taurus*, 913 So. 2d at 539; *Safer*, 317 F. Supp. 2d at 1349. The term "arising out of" is not ambiguous. *Taurus*, 913 So. 2d at 539; *Sparta*, 990 F. Supp. 2d at 1368 (emphasis added) ("The phrase 'arising out of' . . . as used in insurance policies, is **unambiguous**.").

The Court further finds that the lack of definition in the Zurich Policy enumerating massage as a "service . . . for the purpose of . . . therapy" does not create an ambiguity. *Dahl-Eimers*, 986 F.2d at 1382; *see also Flamingo S. Beach*, 492 F. App'x at 20. Massage has a generally accepted meaning of "rubbing, kneading, etc., of the body with the hands for therapeutic benefit." OXFORD AMERICAN DESK DICTIONARY 367 (2d ed. 1998). Likewise, Chapter 480 of the Florida Statutes—titled "Massage Practice"— recognizes that "[m]assage is therapeutic." Fla. Stat. § 480.032.

Accordingly, the Court must endeavor to give effect to the Policy as written in determining whether the Underlying Complaint alleges a "'bodily injury' . . . arising out of

the rendering of or failure to render any service [or] treatment . . . for the purpose of . . . therapy." (Zurich Policy DE 1-4 at 34). The Underlying Complaint alleges, and no Party seriously disputes, that the Signature Stress Melter Ritual was the reason that Escobar came in contact with Doe. It is similarly clear from her allegations that Doe's bodily injury was caused by Escobar's alleged assault during the Signature Stress Melter Ritual. (DE 1-5 ¶ 9). The ordinary dictionary definition of massage and the Florida Statutes provide that massage is therapeutic. Thus, the Court finds that the Signature Stress Melter Ritual was a specified service for the purpose of therapy identified in the Zurich Policy spa exclusion. The Court further finds that the bodily injury alleged in the Underlying Complaint flowed from, was incident to, or had a connection with the Signature Stress Melter Ritual. *Sparta*, 990 F. Supp. 2d at 1368.

Consequently, the spa exclusion applies and the Zurich Policy does not cover the claims alleged in the Underlying Complaint. As a result, Zurich does not have a duty to defend Bonaventure as a named insured and does not have a duty to defend Red Door as an additional insured.[14] The Court now turns to the motions on the Counterclaim and the determination of whether Bonaventure is an additional insured under the Arch Policy.

### 3) Connecticut Law – Arch Policy

Under Connecticut law, the duty to defend arises if the complaint states a cause of action which appears on its face to be within the terms of the policy coverage.

---

[14] Resolution of the issue of the insurers' alleged duty to indemnify is stayed pending resolution of the Underlying Complaint. (DE 62). The Court notes, however, that the duty to defend is broader than the duty to indemnify, and a court's determination that the insurer has no duty to defend also requires a finding that there is no duty to indemnify. *Philadelphia Indem. Ins. Co. v. Yachtman's Inn Condo Ass'n, Inc.*, 595 F. Supp. 2d 1319, 1322 (S.D. Fla. 2009).

*Ciccone*, 900 F. Supp. 2d at 267. Connecticut law differs from Florida law in its duty to defend analysis. *Compare Jones*, 908 So. 2d at 443 *with Ciccone*, 900 F. Supp. 2d at 268. Where Florida prohibits the consideration of extrinsic evidence—that is, outside the eight corners of the underlying complaint and the insurance policy—Connecticut allows extrinsic evidence to be used for limited purposes.

The *Ciccone* court explained: "Connecticut law does occasionally allow an insurer to look outside the allegations made in an underlying complaint in order to establish a duty to defend. But such extrinsic evidence may be considered *solely* in determining whether the duty to defend *exists* under the circumstances of a particular case—**not** in determining that this **duty does not exist**." *Ciccone*, 900 F. Supp. 2d at 268 (italicized emphasis in original; bold underlined emphasis added; internal quotation omitted). The rule results in a broad duty to defend because a liability insurer has a duty to defend if the pleadings allege a covered occurrence, even if facts outside the pleadings indicate the claim is not covered. *Id.* at 267.

When evaluating whether a policy gives rise to a duty to defend, the court "must consider whether any allegation of the complaint falls even possibly within the coverage." *Travelers Prop. Cas. Co. of Am. v. Cont'l Cas. Co.*, Case No. CV084008325, 2010 WL 2574140, at *6 (Conn. Super. Ct. May 27, 2010). Furthermore, where the insurer has knowledge that a claim may fall within coverage, even if the complaint was not properly pleaded to invoke coverage, the insurer is estopped from making the argument that the underlying complaint does not trigger coverage. *Id.* "In determining whether a claim falls within the scope of an insurance policy, the Supreme Court of Connecticut construes broad policy language in favor of

imposing a duty to defend on the insurer, and requires a defense [i]f an allegation of the complaint falls even *possibly* within the coverage." *State Farm Fire & Cas. Co. v. Yoel*, Case No. 03:13CV101 AWT, 2014 WL 4182614, at * 2 (D. Conn. Aug. 21, 2014) (quoting *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.*, 876 A.2d 1139, 1144 (Conn. 2005)) (emphasis in original).

### 4) The Arch Policy Covers Bonaventure

The Blanket Additional Insured Endorsement (DE 23-2 at 49) provides that the Arch Policy covers, as an additional insured, "those persons or organizations who are required under a written contract with [Red Door] to be named as an additional insured, but only with respect to liability for 'bodily injury', 'property damage', or 'personal and advertising injury' caused, in whole or in part, by [Red Door's] acts or omissions or the acts or omissions of [Red Door's] subcontractors." *Id.* The Court's analysis under Connecticut law permits consideration of the Spa Management Agreement that is contemplated by the Arch Policy. *Ciccone*, 900 F. Supp. 2d at 268. The Spa Management Agreement is a written contract requiring that Red Door name Bonaventure as an additional insured under the Arch Policy. (DE 1-1 ¶ 5.4(e)).

The Arch Policy additional insured endorsement also requires that the bodily injury caused by acts or omissions of Red Door or its subcontractors be either:

A.  In the performance of [Red Door's] ongoing operations or [Red Door's] work . . . or

B.  In connection with [Red Door's] premises owned by or rented to Red Door.

(DE 23-2 at 49).[15] The Underlying Complaint alleges that Jane Doe went to Red Door for a service, was assigned Escobar as her masseuse, began to receive a massage, and was sexually assaulted during the Red Door massage treatment. (DE 1-5 ¶¶ 9–13).

Temporally, there can be no argument that the sexual assault took place in the course of the performance of Red Door's ongoing operations. Furthermore, counsel for Arch conceded that there was coverage under the Arch Policy for the claims in the Underlying Complaint. The only dispute is whether the term "caused, in whole or in part, by your acts or omissions" requires an allegation in the Underlying Complaint that the proposed additional insured be vicariously liable, rather than directly liable and if such an allegation is present in the Underlying Complaint.

Arch argues that the relevant policy language has been uniformly interpreted to only provide coverage to an additional insured when the additional insured is vicariously liable for the acts or omissions of the named insured. Arch cites no Connecticut cases for this proposition, but the Court will assume the merit of its interpretation for the purpose of this discussion.

It is beyond peradventure that Arch is on notice that the allegations concerning Escobar or Red Door's acts or omissions could trigger the duty to defend Bonaventure from vicarious liability. Connecticut requires an insurer to provide a defense when "an allegation of the complaint falls even *possibly* within the coverage." *Yoel*, 2014 WL 4182614, at * 2. The complaint alleges respondeat superior against Bonaventure, which is merely one variety of the tort of vicarious liability. *See, e.g., Rinker v. Carnival*

---

[15] Arch is correct that Red Door is not a renter of the premises on the facts before the Court. Accordingly, the Court does not address the second prong regarding rental of the premises.

*Corp.*, 836 F. Supp. 2d 1309, 1318 n.11 (S.D. Fla. 2011). The complaint need not, on its face, set forth every detail triggering coverage if the insurer has reason to know that it may have a duty to defend under the policy. *Travelers*, 2010 WL 2574140, at *6.

The argument at hearing and the evidence before the Court in the form of the Spa Management Agreement, the Arch Policy, the Zurich Policy, and the materials filed in support of the motions make three things clear. One, Escobar was an employee of Red Door and not Bonaventure. Two, the claims against Bonaventure for Respondeat Superior and Negligent Hiring and Retention of Escobar in the Underlying Complaint implicitly make Bonaventure potentially vicariously liable for acts or omissions of Red Door (Escobar's employer and supervisor). Three, the Parties intended for the Arch Policy to function as a professional liability policy that would cover services at the spa run by Red Door on the premises owned by Bonaventure.

Whether or not Bonaventure will ultimately be found liable—vicariously or otherwise—for Escobar's alleged misdeeds, Arch presently has a duty to defend Bonaventure as an additional insured under the Arch Policy Blanket Additional Insured Endorsement. Similarly, Arch has a duty to defend Red Door as a named insured.

## V. CONCLUSION

For the reasons set forth above, it is **ORDERED AND ADJUDGED** that:

   a. Arch and Red Door's motion for summary judgment on the counterclaim (DE 65) is **DENIED**.

   b. Arch and Red Door's motion for summary judgment on the complaint (DE 67) is **DENIED**.

   c. Zurich's motion for summary judgment on its affirmative defenses to the complaint (DE 69) is **GRANTED**.

   d. Zurich's motion for partial summary judgment on its counterclaims (DE 71) is **GRANTED**.

**e.** The Clerk is directed to **ADMINISTRATIVELY CLOSE** the case.  The Parties shall notify the Court within 72 hours of resolution of the claims raised in the Underlying Complaint.

**DONE AND ORDERED** in chambers in Miami, Florida, this *13* day of November, 2014.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE